**UNITED STATES of America, Plaintiff,**

v.

**Samad Madir HARVEY, Defendant.**

**Criminal Action No. 1:12CR29.**

United States District Court, N.D. West Virginia.

Oct. 25, 2012.

Zelda E. Wesley, U.S. Attorney's Office, Clarksburg, WV, for Plaintiff.

### MEMORANDUM OPINION AND ORDER ADOPTING REPORTS AND RECOMMENDATIONS

IRENE M. KEELEY, District Judge.

Before the Court are the defendant's two motions to suppress a firearm recovered during a search of his residence. (Dkt. Nos. 20 & 21). At a hearing on October 9, 2012, the Court heard oral argument on the motions, after which, for the reasons that follow, it **ADOPTED** the magistrate judge's Reports and Recommendations in their entirety (dkt. nos. 33 & 35), **DENIED** the first motion to sup-

press (dkt. no. 20), **GRANTED** the second motion to suppress (dkt. no. 21), and **SUPPRESSED** the firearm.

## I.

On May 1, 2012, a grand jury indicted the defendant, Samad Madir Harvey ("Harvey"), for being a convicted felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). On September 13, 2012, Harvey filed two motions to suppress the .22 caliber pistol that is the basis of the Indictment in this case. (Dkt. Nos. 20 & 21). Pursuant to 28 U.S.C. § 636, the Court referred these motions to the Honorable John S. Kaull, United States Magistrate Judge, who conducted a suppression hearing on September 24, 2012. Later that same week, he entered two separate Reports and Recommendations ("R & Rs") recommending that the Court deny the first motion to suppress (dkt. no. 33) and grant the second motion to suppress (dkt. no. 35). The defendant filed timely objections to the first R & R on October 2, 2010 (dkt. no. 40), and, seven days later, the government filed timely objections to the second R & R (dkt. no. 47). The parties' motions are now ripe for review.

## II.

The Court reviews *de novo* any portions of a magistrate judge's R & R to which a specific objection is made, 28 U.S.C. § 636(b)(1), but may adopt, without explanation, any of the magistrate judge's recommendations to which no objections are filed. *Solis v. Malkani,* 638 F.3d 269, 274 (4th Cir.2011) (citing *Camby v. Davis,* 718 F.2d 198, 200 (4th Cir.1983)). In the absence of a timely objection, the Court need "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Diamond v. Colonial Life & Acc. Ins. Co.,* 416 F.3d 310, 315 (4th Cir.2005) (citation omitted). The failure to file specific objections to the magistrate judge's recommendations waives any appellate review of the factual and legal issues presented. *Page v. Lee,* 337 F.3d 411, 416 n. 3 (4th Cir. 2003); *see also Thomas v. Arn,* 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

## III.

The defendant's first motion to suppress challenges the constitutionality of the police officer's stop of the car in which he was a passenger. (Dkt. No. 20). In an R & R issued on September 26, 2012, Magistrate Judge Kaull found that this traffic stop complied with the Fourth Amendment and recommended that the Court deny the motion. (Dkt. No. 33 at 10). Harvey objects to the recommendation on the ground that there was no antecedent traffic violation and thus "no lawful basis" for the stop in this case. (Dkt. No. 40 at 4).

### A.

On December 16, 2010, Officer Kenneth Walker Murphy ("Officer Murphy"), a member of the Street Crimes Unit of the Morgantown Police Department, was on patrol within the city limits of Morgantown, West Virginia. (Dkt. No. 44 at 5, 19). At approximately 9:45 p.m., he observed "a silver Jaguar driving on University Avenue without a registration displayed." *Id.* at 5. He proceeded to follow the vehicle until he was able to conduct a traffic stop. *Id.* at 5–6; *see also id.* at 18 ("My original reason for the stop was because there was no registration."). The stop itself occurred at the house where both Harvey, one of two passengers in the silver Jaguar, and the driver resided. *Id.* at 6.

After the officer exited his vehicle and approached the Jaguar on foot, he noticed

a piece of "white paper," which he identified as a New Jersey temporary registration card, in the rear window. *Id.* at 6; *see also id.* at 18 ("Once I turned [a spotlight] on to illuminate the vehicle, I saw that registration."). The rear window was not tinted, and the card itself was not ·obscured. *Id.* at 44. Officer Murphy testified that the display of this temporary card nevertheless violated Morgantown City Code ("MCC") § 351.03,[1] which requires a registration plate to be "clearly visible." *Id.* at 6. He thus proceeded with the normal incidents of a routine traffic stop, asking the driver, later identified as Rashawn Billingsley ("Billingsley"), for his license, registration, and proof of insurance. *Id.* at 7, 8. Billingsley, who identified himself by a false name, was unable to produce any of the requested documents. *Id.* at 8.

While Officer Murphy was questioning Billingsley, three other police officers, Officer Trump, Sgt. Knight, and Officer Jason Kevin Ammons ("Officer Ammons"), arrived at the scene to serve as backup. *Id.* at 26. After Officer Trump signaled to the other officers that he could smell marijuana emanating from the open windows of the car, *id.* at 26–27, they removed the three individuals from the Jaguar and performed a limited pat-down for weapons. *Id.* The officers then conducted a search of the vehicle, where they found a device for smoking marijuana, i.e., a water bong, in the trunk. *Id.* at 27. As this search concluded, the officers' focus turned to affirmatively identifying the three occupants of the silver Jaguar. *Id.* As discussed in detail later in this opinion, Officer Ammons

was "tasked with locating [Harvey's] identification." *Id.*

## B.

■ The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The "[t]emporary detention of individuals during the stop of an automobile by police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States,* 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

■ As such, the familiar "dual inquiry" of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), governs the legality of police conduct in routine traffic stops. *United States v. Guijon–Ortiz,* 660 F.3d 757, 764 (4th Cir.2011) (citing *United States v. Rusher,* 966 F.2d 868, 875 (4th Cir.1992)). In order to survive judicial scrutiny, the police officer's conduct during a traffic stop must be both "justified at its inception," *Rusher,* 966 F.2d at 875, and "sufficiently limited in scope and duration." *Guijon–Ortiz,* 660 F.3d at 764 (quoting *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion)).

## 1.

■ The government contends that Officer Murphy had reasonable, articulable suspicion to believe Billingsley was driving without "clearly visible" registration in vio-

---

1. MCC § 351.03 provides:
 Registration plates issued for vehicles required to be registered shall be attached to the rear thereof. Every registration plate shall at all times be securely fastened in a horizontal position to the vehicle for which it is issued so as to prevent the plate from

swinging and at a height of not less than twelve inches from the ground, measuring from the bottom of such plate, in a place and position to be clearly visible and shall be maintained free from foreign materials and in a condition to be clearly legible.

lation of MCC § 351.03. As a general rule, an automobile stop "must be justified by probable cause or a reasonable suspicion, based on specific and articulable facts, of unlawful conduct." *United States v. Wilson*, 205 F.3d 720, 722–23 (4th Cir.2000). Although "a mere 'hunch'" is generally insufficient, "a reasonable basis need not establish probable cause and may well 'fall[ ] considerably short of satisfying a preponderance of the evidence standard.'" *United States v. Massenburg*, 654 F.3d 480, 485 (4th Cir.2011) (quoting *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)). An officer's observation of a traffic violation, no matter how minor, provides probable cause to stop the driver. *United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir.1993); *see also United States v. Davis*, 460 Fed. Appx. 226, 230 (4th Cir.2011) ("Traffic stops are justified at their inception when officers observe a violation of the applicable traffic laws." (citing *United States v. Branch*, 537 F.3d 328, 335 (4th Cir.2008)).

The Morgantown City Code section relied upon by Officer Murphy states in pertinent part:

Registration plates issued for vehicles required to be registered shall be attached to the rear thereof. Every registration plate shall at all times be securely fastened in a horizontal position to the vehicle for which it is issued so as to prevent the plate from swinging and at a height of not less than twelve inches from the ground, measuring from the bottom of such plate, in a place and position to be clearly visible and shall be maintained free from foreign materials and in a condition to be clearly legible.

MCC § 351.03; *see also* W. Va.Code § 17A–3–15. The Court notes that there is a paucity of authority concerning both this municipal provision and its statutory analogue; no federal or state court in

West Virginia has elaborated on the contours of this particular traffic offense. Nevertheless, as the defendant points out in his objections, the plain meaning of Section 351.03 is clear: a registration plate, "at all times," must be displayed such that it is clearly visible and legible to an officer following at a safe distance. MCC § 351.03.

■ Here, in order to justify the stop of Billingsley's vehicle, Officer Murphy must have possessed "some minimal level of objective justification," *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), to believe that the temporary registration was not displayed "in a place and position to be clearly visible" pursuant to MCC § 351.03. Officer Murphy credibly testified that (1) the vehicle's registration was not in the "proper registration spot," i.e., the license plate well, where it "would normally go," (dkt. no. 44 at 17); (2) although he looked at the window of the car as well as the license plate well prior to initiating the traffic stop, he did not see any registration, *id.* at 16–17; and (3) he did not observe the temporary registration card until "[a]fter the stop was conducted," *id.* at 16, when he turned on a "spotlight," *id.* at 18, and "[a]pproached the vehicle" on foot. *Id.* at 16. Accordingly, as the magistrate judge found, the "credible and uncontradicted testimony in this case is that Officer Murphy did not see any registration plate whatsoever on the vehicle prior to making the traffic stop." (Dkt. No. 33 at 6). As Officer Murphy had an objectively reasonable suspicion that the vehicle was operating in violation of MCC § 351.03, the traffic stop was "justified at its inception." *Rusher*, 966 F.2d at 875.

**2.**

■ A police officer's actions during a lawfully initiated traffic stop must be

"reasonably related ... to the circumstances that justified the [stop]." *Rusher*, 966 F.2d at 875 (quoting *Terry*, 392 U.S. at 20, 88 S.Ct. 1868). Accordingly, traffic stops must be duly limited in both scope and duration. *United States v. Digiovanni*, 650 F.3d 498, 507 (4th Cir.2011). Thus, to determine whether Officer Murphy's stop was sufficiently limited, the Court must consider "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Guijon–Ortiz*, 660 F.3d at 764. To prolong a stop "beyond the scope of a routine traffic stop," an officer "must possess a justification for doing so other than the initial traffic violation that prompted the stop in the first place." *Branch*, 537 F.3d at 336. This requires "either the driver's consent or a 'reasonable suspicion' that illegal activity is afoot." *Id.*

 In the course of an ordinary traffic stop, an officer may justifiably detain "the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." *Branch*, 537 F.3d at 335. These "traditional incidents" include "requesting a driver's license and vehicle registration, running a computer check, and issuing a ticket." *Digiovanni*, 650 F.3d at 507 (citation omitted). An officer may also request identification from any of the vehicle's passengers, *United States v. Soriano–Jarquin*, 492 F.3d 495, 500 (4th Cir.2007), and "order the driver as well as any passengers to get out of the car pending completion of the stop." *United States v. McGee*, 2:11–191, 2011 WL 5119528, at *3 (S.D.W.Va. Oct. 27, 2011) (citations omitted).

Although not framed as a specific objection, Harvey contends that the unobstructed display of his temporary registration card in the rear window of the vehicle did in fact comply with MCC § 351.03. If, as this argument implies, Officer Murphy was simply mistaken when he failed to observe the registration card prior to initiating the traffic stop, his reasonable mistake of fact would not undermine the conclusion that he had reasonable suspicion to execute the stop in the first instance. *See, e.g., United States v. Mubdi*, 691 F.3d 334, 342 (4th Cir.2012) (" '[I]f an officer makes a traffic stop based on a mistake of fact, the only question is whether his mistake of fact was reasonable.' " (citation omitted)). Whether Officer Murphy subsequently observed a valid registration plate does, however, have potential implications as to the appropriate scope and duration of the traffic stop. *See United States v. Ortiz*, 669 F.3d 439, 444 (4th Cir.2012) ("officers may not detain the vehicle for longer than necessary to accomplish the purposes of the stop" (citing *Illinois v. Caballes*, 543 U.S. 405, 407–408, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005)).

The Tenth Circuit addressed this issue in *United States v. McSwain*, 29 F.3d 558 (1994). There, an officer stopped a vehicle that he suspected had an invalid temporary registration tag. Although the officer realized shortly after making the stop that the vehicle's tag was indeed valid, he nevertheless proceeded to request the defendant's license and registration. *Id.* at 560. According to the Tenth Circuit, the officer violated the Fourth Amendment by doing so because his "reasonable suspicion regarding the validity of [the defendant's] temporary registration sticker was completely dispelled *prior* to the time he questioned [the defendant] and requested documentation." *Id.* at 561 (emphasis in original). Since the officer did not have "objectively reasonable articulable suspicion that illegal activity had occurred or was occurring," his actions "exceeded the limits of a lawful investiga-

tive detention and violated the Fourth Amendment." *Id.* at 561–62 (citation omitted).[2]

The Fourth Circuit has not considered whether an officer must end a traffic stop without requesting a driver's license and registration when the officer's reasonable suspicion has been completely dispelled. Nevertheless, such a rule is inapposite under the facts of this case. As the magistrate judge found, after Officer Murphy approached the vehicle and verified the existence of the registration card, it was objectively reasonable for him to believe that its display violated MCC § 351.03.

Turning to the plain language of that provision, the Court bears in mind that, under West Virginia's rules of statutory interpretation,

> [s]tatutes which relate to the same persons or things, or to the same class of persons or things, or statutes which have a common purpose will be regarded *in pari materia* to assure recognition and implementation of the legislative intent. Accordingly, a court should not limit its consideration to any single part, provision, section, sentence, phrase or word, but rather review the act or statute in its entirety to ascertain legislative intent properly.

Syl. Pt. 6, *Community Antenna Serv., Inc. v. Charter Commun. VI, LLC,* 227 W.Va. 595, 712 S.E.2d 504 (2011) (quoting Syl. Pt. 5, *Fruehauf Corp. v. Huntington Moving & Storage Co.,* 159 W.Va. 14, 217 S.E.2d 907 (1975)).

Pursuant to the plain language of MCC § 351. 03, "[e]very registration plate" must be clearly visible and clearly legible "at all times," with no exception for the nighttime hours. MCC § 351.03. The MCC itself cross-references this Article with MCC § 345.05, which dictates that the registration plate be illuminated and thus legible even in the dark: "[e]ither a tail lamp or a separate lamp shall be so constructed and placed as to illuminate with a white light the rear registration plate and render it clearly legible from a distance of fifty feet to the rear." *See also* W. Va.Code § 17C–15–5. The defendant has identified no exception to this requirement relating to temporary registration tags. *Cf. United States v. Foster,* 65 Fed.Appx. 41, 44 (6th Cir.2003) ("the absence of a provision exempting temporary tags from the general applicability of [the statute] supports the proposition that they are subject to the same illumination requirements as are permanent plates").

In this case, Officer Murphy testified that he observed Billingsley's silver Jaguar driving down the street at night without visible registration where it "would normally go," i.e., the illuminated license plate well. (Dkt. No. 44 at 17). He further testified that he could not see the registration in the window of the car prior to conducting the traffic stop, even though he looked. (Dkt. No. 44 at 17). Finally, he maintained that he "could not see that registration [in the rear window] as the vehicle passed me when I was doing my enforcement." (Dkt. No. 44 at 16). The defendant has not pointed to anything implausible or unreasonable in the officer's inability to see the registration card in the rear window, unilluminated, at night.

---

**2.** The Tenth Circuit noted, however, that it would not offend the Fourth Amendment if, "[a]s a matter of courtesy," the officer approached the driver to explain "the reason for the initial detention." *McSwain,* 29 F.3d at 562. This "brief encounter between an officer and driver ... might independently give rise to facts creating reasonable suspicion of criminal activity, thus warranting further investigation." *United States v. Edgerton,* 438 F.3d 1043, 1051 (10th Cir.2006); *accord United States v. Jenkins,* 452 F.3d 207, 212–13 (2d Cir.2006).

The Court finds that MCC § 345.05 serves to assure that MCC § 351.03 is given its appropriate reach. When the two provisions are considered *in pari materia*, it is apparent that mere unobstruction, standing alone, is not enough to render a registration plate "clearly visible" or "clearly legible" during the nighttime hours.[3] Thus, in the circumstances of this case, the placement of the registration in the rear window of the vehicle rendered it not "clearly visible" under MCC § 351.03, and Officer Murphy was justified in pursuing the normal incidents of the traffic stop. *Branch*, 537 F.3d at 335. Consequently, upon Officer Trump's detection of marijuana, Officer Murphy was authorized to expand the scope and duration of the stop. *United States v. Rooks*, 596 F.3d 204, 210 (4th Cir.2010).

**IV.**

Having determined that the initial traffic stop was valid, the Court turns next to Harvey's second motion to suppress (dkt. no. 21), in which he contends there is no evidence that he consented to Officer Ammons' warrantless entry into his residence subsequent to the traffic stop. As such, he argues, any evidence obtained as a result of that search must be suppressed. In his R & R issued on September 28, 2012, Magistrate Judge Kaull agreed, recommending that the Court grant the defendant's motion and suppress any contraband seized pursuant to the later warrant obtained as a result of that illegal predi-

cate search. (Dkt. No. 35 at 24). The government, which has restricted its argument solely to the issue of implied consent, objects that "the circumstances of defendant's case demonstrates [sic] he consented to the officer entering his residence with him." (Dkt. No. 47 at 10).

**A.**

At some point after the officers searched the interior of the silver Jaguar on December 16, 2010, Officer Ammons asked Harvey, who was detained but not under arrest, for his name and date of birth. Although Harvey maintains that he provided accurate information in response to this inquiry, (dkt. no. 44 at 54), it is undisputed that the 911 center had "no return" for the name the officer provided. *Id.* at 46. Officer Ammons testified that, when he informed the defendant that the center was unable to verify his information, Harvey stated, "My identification is in the house." (Dkt. No. 44 at 46). Harvey, with a slightly different recollection, testified that he overheard and corrected the fallacious pronunciation of "Harvey" that Officer Ammons provided the dispatcher, at which point the officer became "agitated" and asked, "[W]hich one is it, Harvey or Harding[?]" *Id.* at 51. Harvey testified that he responded, "My ID is in my crib," *id.* at 51, and "left it just like that." *Id.* at 58.

According to Officer Ammons, after this initial exchange, Harvey "said he could

---

**3.** *Cf. United States. v. Lucas*, 322 Fed.Appx. 326, 328 (4th Cir.2009) ("[T]he display of the registration tag was unlawful under North Carolina law, as the tag was not properly illuminated under § 20–129(d) of the North Carolina Code. Accordingly, the fact that the tag was displayed in the rear window in a manner in which it was unreadable provided the officer with probable cause to stop Lucas' vehicle."); *United States v. Dycus*, 151 Fed. Appx. 457, 460–61 (6th Cir.2005) (Under Ten-

nessee law, a registration plate to be clearly visible at all times must be illuminated); *United States v. Foster*, 65 Fed.Appx. 41, at *3 (6th Cir.2003) (Illinois temporary license tag posted in rear windshield violated Kentucky traffic code requiring license plates to be kept legible and illuminated). *But see Edgerton*, 438 F.3d at 1051 (refusing to find temporary tag not "clearly visible" simply because "it was dark out").

retrieve [the identification]. And, of course, I would have to escort him in to get that, because I'm not letting anybody walk in a house to come back out ... so I escorted him inside." *Id.* at 28. Harvey, however, testified that, "[a]fter I replied ['My ID is in my crib']," *id.* at 58, Officer Ammons "just told me, Well, I'm going to escort you inside your house, and you're going to give me your I.D. ... I didn't question him. I didn't say nothing. I just did what he told me to do." *Id.* at 52.

Notably, although Officer Ammons intimated at one point that he had told Harvey he would escort him into the residence,[4] *id.* at 28, he later testified that he could not recall what, if anything, he had actually said to the defendant prior to his entry into the home. *Id.* at 47–48. If he "would have explained anything," Officer Ammons testified, "it would have been—if [Harvey's] going in the house, then I'm going in with him, period." *Id.* at 47. Officer Ammons was unequivocal, however, that he "did not ask [Harvey] if [he] could go in the home with him," and that Harvey did not "tell [him] that [he] could go with him in the home." *Id.* at 48. "But," Officer Ammons emphasized, "he never told me I couldn't." *Id.* For his part, Harvey maintains that Officer Ammons stated, "I'm going to escort you inside of your residence, and you're going to give me your I.D." *Id.* at 57. When queried as to whether he had in fact made such a statement, Officer Ammons replied, "Not that I recall." *Id.* at 47.

Harvey testified that Officer Ammons walked into the residence first, ahead of him, while another officer stood at the door. *Id.* at 53. After verifying that Harvey was still "detained" and "not free to leave" at this point, *id.* at 46–47, Officer Ammons stated that he walked "with" Harvey into the house, *id.* at 28, and that, once inside, the defendant walked into his actual bedroom "in front" and "on his own." *Id.* at 30.

Once the pair were inside the defendant's bedroom, the officer observed Harvey open a drawer and then "tr[y] to shield what he was doing with his body." *Id.* at 30. As described by the officer, Harvey pantomimed retrieving his identification from the drawer, although he in fact simply pulled it from the pocket of his pants. *Id.* at 31.[5] Officer Ammons then observed, in plain view, an open "Rice–A–Roni box on the table right beside where that drawer was" with what looked to be "the packaging of heroin" sticking out of it. *Id.* at 31. He also "smell[ed] green, or raw marijuana," at which point he decided to clear the home and seek a search warrant. *Id.* at 33.

After exiting the residence, Officer Ammons relayed his observations to the Mon Valley Task Force, *id.* at 34, and Officer Dave Helms used his statements to prepare a probable cause affidavit in support of a search warrant for the home. *Id.* Officer Ammons went on to check the name on Harvey's identification with the 911 center and, after it came back with an

---

**4.** In response to the government's query as to whether he had told the defendant that he would accompany him into the house, Officer Ammons replied, "Yes, he was not handcuffed, and I was walking with him. We walked upstairs and walked into the house. He never once stopped and said, you know, you can't come in or anything like that." (Dkt. No. 44 at 28). After due consideration of the credibility of the witnesses and the "consistency and inconsistencies" in their tes-

timony, Magistrate Judge Kaull found that Officer Ammons "held a preconceived view that he would escort [Harvey] into the house even though he did not express that to Defendant at any time before entry." (Dkt. No. 35 at 22).

**5.** The defendant denies this version of events. *Id.* at 56.

outstanding warrant, he placed Harvey under arrest. *Id.* Subsequent to the execution of the search warrant, law enforcement officials recovered a .22 caliber pistol from the drawer in Harvey's bedroom. *Id.* at 35.

**B.**

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. As a general rule, then, "searches and seizures inside a home without a warrant are presumptively unreasonable," *Kentucky v. King,* — U.S. —, 131 S.Ct. 1849, 1856, 179 L.Ed.2d 865 (2011) (quoting *Brigham City v. Stuart,* 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006)), subject to "a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Voluntary consent operates as one of the principal exceptions to the Fourth Amendment's prohibition against warrantless searches. *United States v. Neely,* 564 F.3d 346, 350 (4th Cir.2009) (per curiam); *see also Florida v. Jimeno,* 500 U.S. 248, 250–51, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) ("[I]t is no doubt reasonable for the police to conduct a search once they have been permitted to do so."). Consent need not be expressed in a particular form, but "may be inferred from actions as well as words." *United States v. Hylton,* 349 F.3d 781, 786 (4th Cir.2003).

When the government seeks to justify a warrantless search based on consent, it bears the burden of proving, by a preponderance of the evidence, that it obtained knowing and voluntary consent. *United States v. Toyer,* 414 Fed.Appx. 584, 588 (4th Cir.2011) (citing *United States v. Buckner,* 473 F.3d 551, 554 (4th Cir.2007)). This "burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina,* 391 U.S. 543, 548–49, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). Rather, the standard is one of " 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Jimeno,* 500 U.S. at 251, 111 S.Ct. 1801 (citations omitted); *Neely,* 564 F.3d at 350.

Where the purported consent is implied, as opposed to explicit, the government's burden " 'is heavier ... since consent is not lightly to be inferred.' " *Neely,* 564 F.3d at 350 (quoting *United States v. Impink,* 728 F.2d 1228, 1232 (9th Cir.1984)). Whether a defendant gave voluntary consent is a question of fact, *United States v. Lattimore,* 87 F.3d 647, 650 (4th Cir.1996), which the Court "determine[s] by the totality of all the circumstances." *United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (internal citations omitted).

The existence of consent and the voluntariness of consent are "related, but analytically distinct" issues. *United States v. Carter,* 300 F.3d 415, 423 (4th Cir.2002). The Court looks first to whether the defendant's words or conduct could reasonably be interpreted as providing consent. *See United States v. Scott,* No. 1:10–48, 2010 WL 5067906, at *4 (M.D.N.C. Dec. 6, 2010); *see also United States v. Freeman,* 482 F.3d 829, 831 (5th Cir.2007) ("First, as a threshold matter, the government must demonstrate that the defendant did consent."); *United States v. Griffin,* 530 F.2d 739, 743 (7th Cir.1976) (same). Once the government establishes the defendant's consent, the Court must determine whether that consent was voluntary. *Scott,* 2010

WL 5067906, at *5; *Freeman,* 482 F.3d at 832; *Griffin,* 530 F.2d at 743.

### C.

In its objections to the R & R, the government argues that the defendant implicitly consented to Officer Ammons' warrantless search by

(1) offering to obtain the license from his residence knowing that he would be accompanied by the officer, (2) not expressly stating that he did not want the officer in his residence, and (3) not producing his driver's license establishing his identity which would have ended the reason for entering the residence.

(Dkt. No. 47 at 10).

### 1.

■ As a threshold matter, the government's first argument, that Harvey "offer[ed] to retrieve his identification" from the residence with the "know[ledge] that he would be accompanied by the officer," (dkt. no. 47 at 10), is neither factually supported by the evidentiary record nor indicative of implied consent. There is no question that consent to search can be implied from a person's "words, gestures, or conduct." *United States v. Moreland,* 437 F.3d 424, 429 (4th Cir.2006); *see also Hylton,* 349 F.3d at 786. Although consent must constitute more than mere acquiescence to apparent lawful authority, *Lattimore,* 87 F.3d at 652, " '[m]agic words' (such as 'yes') are not necessary to evince consent because 'the key inquiry focuses on what the typical reasonable person would have understood by the exchange between the officer and the suspect.' " *Guerrero v. Deane,* 750 F.Supp.2d 631, 646–47 (E.D.Va.2010) (quoting *United States v. Bynum,* 125 F.Supp.2d 772, 783 (E.D.Va.2000), *rev'd on other grounds,* 293 F.3d 192 (4th Cir.2002)). Accordingly, the key inquiry here is simply whether, based on the totality of the circumstances, Harvey's conduct "would have caused a reasonable person to believe that he consented." *United States v. Castellanos,* 518 F.3d 965, 969 (8th Cir.2008) (citation omitted).

The undisputed testimony is that, in response to Officer Ammons' query regarding his actual name, Harvey stated either "My identification is in the house" or "My I.D. is in my crib." (Dkt. No. 44 at 46, 51). According to Officer Ammons, Harvey then followed up with a statement along the lines of, "he could retrieve [the identification]." *Id.* at 28. The officer testified that he could not recall whether he explained to Harvey that he would accompany him, although he stated that "[i]f I would have explained anything, it would have been—if [Harvey's] going in the house, then I'm going with him, period." *Id.* at 48.

Officer Ammons did not elaborate as to what happened next, other than that "[he] escorted [Harvey] in the house." *Id.* at 46; *see also id.* at 28 ("I escorted him inside."). Harvey, however, insists that the officer then directed, "I'm going to escort you inside of your residence, and you're going to give me your I.D," *id.* at 57, which Officer Ammons could not "recall." (Dkt. No. 44 at 47).

■ Under the circumstances of this case, no reasonable person could have interpreted Harvey's simple statement of fact regarding the location of his identification as an "offer" to permit an officer to accompany him into the home in order to retrieve that identification. *See, e.g., United States v. Cole,* 195 F.R.D. 627, 632 (N.D.Ind.2000) (noting parenthetically that "statement of location of an object does not in itself indicate consent for police to search for object" (citing *United States v. Zertuche–Tobias,* 953 F.Supp. 803, 827 (S.D.Tex.1996)). Nor has the government

identified any other statement, gesture, or other conduct by Harvey which could have implied consent.[6]

Inasmuch as Officer Ammons testified that Harvey said "he *could* retrieve" the identification, (dkt. no. 44 at 28 (emphasis added)), which the defendant disputes, the Court finds that this statement, devoid as it is of any contextual elaboration, is just as likely to represent an inquiry as to whether the officer would *require* him to retrieve the identification as it is an "offer" to obtain it. In the absence of any further dialogue, no reasonable officer could interpret such a statement as an invitation to enter the residence in order to retrieve the identification.

Moreover, there is no evidence in the record of any statement, gesture, or other conduct by Officer Ammons that could be reasonably construed as a request for consent. Indeed, his most definitive testimony was when he averred that he "did not ask [Harvey] if [he] could go in the home with him," and that Harvey did not "tell [him] that [he] could go with him in the home." *Id.* at 48. This is particularly noteworthy in light of the fact that a request for permission, in some capacity, is often seen as a necessary predicate for reasonably inferring implied consent. *See, e.g., United States v. Jaras,* 86 F.3d 383, 390 (5th Cir.1996) (consent cannot reasonably be implied from a suspect's silence or failure to object unless the officer expressly or impliedly asked for consent to search); *United States v. Shaibu,* 920 F.2d 1423, 1427 (9th Cir.1990) (an affirmative act in response to a police request was needed in order to infer implied consent); *Guerrero,* 750 F.Supp.2d at 646–47 ("In examining the totality of the circumstances to determine whether a reasonable officer would interpret a gesture or conduct as consent, it is necessary to consider the question posed by, and the actions of, the law enforcement officers to which the defendant's non-verbal conduct was a response." (quoting *Bynum,* 125 F.Supp.2d at 783)).

**2.**

In the absence of any gestures or conduct that could reasonably be construed as consent, Harvey's implied consent would have to be premised exclusively on his silence and lack of resistance to Officer Ammons' actions. Notably, the government has cited to no case stating that consent to search can, in the first instance, be inferred solely from the silence of a defendant who was never asked. Rather, the weight of authority holds that " 'the government may not show consent to enter from the defendant's failure to object to the entry. To do so would be to justify entry by consent and consent by entry.' " *United States v. Gonzalez,* 71 F.3d 819, 830 (11th Cir.1996) (quoting *Shaibu,* 920 F.2d at 1427), *overruled on other grounds by Arizona v. Gant,* 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009); *see also United States v. Little,* 431 Fed.Appx. 417, 420–421 (6th Cir.2011) (no implied consent where officer "merely followed Defendant into the house when Defendant went in to get additional clothing"); *Roe v. Texas Dept. of Protective and Regulatory Services,* 299 F.3d 395, 402 (5th Cir.2002) ("Silence or passivity cannot form the basis for consent to enter.").

 Here, the sole evidence is that, after the defendant mentioned the location of his identification, he was either led or escorted into his home by law enforce-

---

**6.** The Court notes that there is no testimony, for example, that Harvey made the first movement towards the home—the sole testimony offered by Officer Ammons is that he "escort[ed]" and walked "with" Harvey into the house. *Id.* at 28. Again, Harvey elaborates that he simply followed the officer to the house. *Id.* at 53.

ment. It is undisputed that he was "detained" and "not free to leave" pursuant to the ongoing investigation centered around the original traffic stop. (Dkt. No. 44 at 46–47). There is no evidence that Harvey said or did anything which would give rise to a reasonable inference of consent, or that Officer Ammons said or did anything which would give rise to a reasonable inference that consent was requested. A reasonable person under these circumstances would have believed that the Officer was legally authorized to either lead or escort him into the home.

As such, the Court concludes that, under the circumstances of this case, Harvey's silence and lack of resistance in response to Officer Ammons' accompaniment evinces, at most, a mere acquiescence to a show of lawful authority. *See, e.g., Cole*, 195 F.R.D. at 634 (suspect told that police "needed" his identification simply acquiesced to lawful authority); *see also United States v. Vasquez*, 638 F.2d 507, 526–27 (2d Cir.1980) (when police told defendant they were going to take him home to arrest his wife, defendant did not consent to entry, as the matter was "presented to him as a fait accompli"); *United States v. Mapp*, 476 F.2d 67, 78 (2d Cir. 1973) (when police told woman at her apartment that "we want the package" consent was not voluntary, in part because this "was an outright demand—without ifs, ands or buts"); *United States v. Gwinn*, 46 F.Supp.2d 479, 484 (S.D.W.Va.1999) (defendant's "mere acquiescence to the search was not enough to constitute implied consent").

### 3.

■■■ The final prong of the government's totality-of-the-circumstances argument is that Harvey consented to the

search by "not producing his driver's license establishing his identity." (Dkt. No. 47 at 12). Whether consent can be implied in the first instance, however, is an objective inquiry. *See Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006) ("An action is 'reasonable' under the Fourth Amendment ... as long as the circumstances, viewed objectively, justify the action." (citations omitted)); *see also United States v. Smith*, 395 F.3d 516, 519 (4th Cir.2005) ("[T]he Fourth Amendment does not even require that the suspect actually consent to a government search; factual determinations by the government, such as the presence of consent, must be reasonable, but are not required always to be correct." (emphasis omitted)). "The particular personal traits or subjective state of mind of the defendant are irrelevant to the objective 'reasonable person' test ... other than to the extent that they may have been known to the officer and influenced his conduct." *United States v. Hill*, 199 F.3d 1143, 1149 (10th Cir.1999) (citations omitted). Here, there is no indication that Officer Ammons was aware of any deceptive conduct by Harvey prior to their entry into the residence. As such, this factor does not weigh in the determination of the existence of implied consent.[7]

### 4.

The evidentiary record in this case is undeniably scant. The government only called one witness, Officer Ammons, to testify as to the circumstances surrounding his entry into Harvey's residence. To the extent that this testimony left gaps in the record, they can only be filled by Harvey, the sole testifying witness for the defense. After closely examining the evidentiary

---

7. Even if the Court were to consider such evidence, any arguably duplicitous conduct by Harvey is only one factor, and it is out- weighed by the dearth of evidence already discussed.

record and conducting a *de novo* review of the issues presented, the Court agrees with the conclusion of the magistrate judge that the government "has not met its burden of proving by a preponderance of the evidence that [Harvey] voluntarily consented to Officer Ammons entering his residence." (Dkt. No. 35 at 22).

## D.

■■■ The government argues that, in the alternative, the *Leon* good-faith exception to the exclusionary rule should permit admission of the seized evidence. *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The Fourth Circuit, however, has recognized that the good-faith exception does not apply where the search warrant was prompted by an unlawful predicate search. *United States v. Mowatt,* 513 F.3d 395, 405 (4th Cir. 2008), *abrogated on other grounds, Kentucky v. King,* — U.S. —, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011); *see also United States v. Gray,* 302 F.Supp.2d 646, 654 (S.D.W.Va.2004). The Fourth Amendment violation in this case occurred during Officer Ammons' initial, prewarrant entry into Harvey's home. Officer Helms then obtained a search warrant on the basis of the observations Officer Ammons made during the unlawful entry.[8] As such, the *Leon* good-faith exception is inapplicable.

■■■ The Court recognizes that "suppression is not an automatic consequence of a Fourth Amendment violation," and that the "question turns on the culpability of the police and the potential to deter wrongful police conduct." *Herring v. United States,* 555 U.S. 135, 137, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009). The facts of this case, however, justify the application of the exclusionary rule to suppress the evidence seized. Here, " 'a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.' " *Id.* at 141, 129 S.Ct. 695 (citation omitted). This is not a case of "isolated negligence" that was otherwise "attenuated" from the unlawful search. *Id.* at 135, 129 S.Ct. 695. Rather, the officers' conduct in this case is capable of " 'meaningfu[l]' deterrence" and culpable enough to be "worth the price paid by the justice system" of the exclusion of the evidence. *Id.* at 144, 129 S.Ct. 695. To find otherwise would be to permit the " 'physical entry of the home,' " which is the " 'chief evil against which the wording of the Fourth Amendment is directed.' " *Welsh v. Wisconsin,* 466 U.S. 740, 748, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) (quoting *United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)).

## V.

In conclusion, for the reasons discussed, the Court:

1. **ADOPTS** the magistrate judge's reports and recommendations (dkt. nos. 33, 35);

2. **DENIES** the first motion to suppress (dkt. no. 20);

3. **GRANTS** the second motion to suppress (dkt. no. 21); and

4. **SUPPRESSES** the .22 caliber firearm in this case.

It is so **ORDERED.**

The Court directs the Clerk to transmit copies of this Order to counsel of record and all appropriate agencies.

---

**8.** The government did not challenge the magistrate judge's conclusion that the warrant would have lacked a basis in probable cause in the absence of the information gleaned from the unlawful predicate search. The Court finds the magistrate judge's analysis in this regard to be well-founded and correct. *See* (Dkt. No. 35 at 22–23).

## REPORT AND RECOMMENDATION/OPINION

JOHN S. KAULL, United States Magistrate Judge.

On the 24th day of September 2012, came the defendant, Samad Madir Harvey, in person and by L. Richard Walker, his attorney, and also came the United States by its Assistant United States Attorney, Zelda E. Wesley, for a hearing on Defendant's Motion to Suppress Physical Evidence Based on an Illegal Traffic Stop [DE 20] and Motion to Suppress [DE 21], which motions were filed on September 13, 2012. The United States filed a single Response to both Motions on September 21, 2012 [DE 30]. The matter was referred to the undersigned United States Magistrate Judge on September 14, 2012, by United States District Judge Irene M. Keeley [DE 22]. This Report and Recommendation addresses only the second Motion [DE 21]. The first Motion was addressed in the previously filed Report and Recommendation.

### I. Procedural History

On May 1, 2012, Defendant was Indicted by a Grand Jury seated in the Northern District of West Virginia at Clarksburg [DE 1]. He was charged with One Count of possession of a firearm by a convicted felon. Defendant was arraigned on August 9, 2012. The motions before the Court were filed on September 13, 2012.

### II. Contentions

Defendant contends:

1. The officer's entry into Defendant's residence was without warrant, consent or exigent circumstances, and therefore violated Defendant's Fourth Amendment rights.

2. Any evidence seized as a result of the subsequent warrant is fruit of the poisonous tree, and should be suppressed.

Government contends: "[T]he United States will present testimony refuting defendants claims at the suppression hearing."[1]

### III. Statement of Facts

The Court received the sworn testimony of three witnesses under oath, to wit: City of Morgantown Police Officers Jason Ammons and Kenneth Murphey, and Defendant. The Court also received exhibits. From the evidence and testimony presented, the Court makes the following findings of fact:

Officer Murphey had stopped the car in which Defendant was a passenger, for a traffic violation.[2] Officers Trump and Knight arrived at the scene as backup for Officer Murphey. Officer Ammons was the last to arrive at the scene. He was alone in his cruiser. When he arrived Officer Trump signaled[3] to him that he smelled something in the car. Officer Ammons watched the defendant, who was a passenger in the back seat of the vehicle. The smell of burnt marijuana resulted in the additional investigation and justifying a search of the vehicle The officers began removing everyone from the vehicle. Offi-

---

1. United States' Response To Defendant's Motions To Suppress [DE 30] filed September 21, 2012 pursuant to LRCrP 47.01(a) and paragraph 5 of the Court's Initial Scheduling Order [DE 15].

2. The facts regarding the traffic stop itself are discussed in the Report and Recommendation regarding Docket Entry 20.

3. The signal was a non-verbal pointing of the index finger to the nose indicating the presence of the smell of a controlled substance such as marijuana.

cer Ammons removed Defendant with the help of Sgt. Knight. Sgt. Knight took control of Defendant, or stood with him and the other passenger, while Officer Ammons[4] and Officer Murphey searched the vehicle. A water bong was found in the trunk of the vehicle. Sgt. Knight performed a pat down of Defendant for weapons.

After searching the vehicle Officer Ammons asked for Defendant's name and date of birth. Officer Ammons testified he recalled Defendant giving him the first name Samad, but could not recall the last name or date of birth he provided. Defendant testified he gave the officer his correct name and birth date. Officer Ammons called 911, but was informed there was "no return" for that name and date of birth. There is no dispute that Officer Ammons told Defendant there was no return on the name and date of birth he provided. Defendant testified he had told Officer Ammons his correct name, but then heard Officer Ammons give the last name "Hardin" on the phone instead of "Harvey." He told Officer Ammons, "It's Harvey, not Hardin." Officer Ammons then said, "Which one is it?" Defendant did not answer that his name was "Harvey," instead replying, "My ID is in my crib." Officer Ammons testified that Harvey did not have to provide any identification. Ammons then testified: "But if I ask for identification and he provides me false identification, now he is hindering me by lying to me." "We didn't have anybody's, nobody could identify anybody in the vehicle and then the uncle saying 'What name do you want me to tell them?' is what I'm thinking—ok there's something up here—criminal activity is afoot—why are we not getting people's information?" "When I ran it through the 911 center it did not

return." At that point it was Ammons' opinion that Defendant had not committed a crime but that he had provided false information and was hindering the police.

It is undisputed that when Officer Ammons asked Defendant whether his name was Harvey or Hardin, Defendant replied, "My ID is in my crib." Officer Ammons testified: "He [Defendant] said he could retrieve it and-ah—of course I would have to escort him in to get that because I'm not letting anyone walk in a house to come back out, you know, with identification, so I escort them inside." When asked if during the escort Harvey was free to leave Ammons said: "At that point in time, no. We were still trying to figure out who he is now with having information." Defendant was still detained under a minor investigation. As Officer Ammons stated, "He couldn't walk off." Ammons testified the escort he conducted was not mandatory. He testified: "If he is going to go in the house to obtain an identification, then I'm going with him. If he doesn't go in the house to get it, then I'm not going with him." He could not recall whether he told Defendant he was going with him into the house. In fact, Ammon's did not testify he made either statement of opinion to or in the presence of Harvey. He merely testified to his opinions at the suppression hearing. However, he testified that he did not ask Defendant if he could go into the house with him; that Defendant never told him he could go into the house; and "but he never told me I couldn't."

Harvey testified that Ammons said: "I'm going to escort you inside your house and you're gonna give me your ID ... I just left it like that—I didn't question him or nothin' like that, I just did what he told me to do." He testified Ammons went in first, ahead of him. Another officer fol-

---

**4.** Officer Amons first testified he searched the car. Later he impliedly retracted his earlier testimony by testifying that he did not participate in the search of the car.

lowed, but stayed at the door and did not go inside the house.

The undisputed evidence is that Defendant was not handcuffed and the officer did not have his firearm drawn as he entered the house. Defendant was not arrested at the time. He was, however, detained and could not leave. Officer Ammons walked with Defendant into the house. They walked up into the yard, up about 6–8 stairs and then into a front door. It is also undisputed that Defendant "never once stopped and said: you can't come in or anything like that."

From the front door one could see into a kitchen area and the living room. Officer Ammons testified he believed:

> Officer Trump had already entered with his subject because his subject also wouldn't give a valid identification. They were actually I believe sitting on like a little futon couch in that area. There had been an uncle or relative in the house, but during the traffic stop, when the driver asked for his uncle to get his identification—I was actually standing up by the door—the uncle shut the door and I could hear him say on the phone, "What name do you want me to give them?" When I turned to look at the driver, the driver had that deer in the headlights look and he immediately stopped talking. So, I don't recall if we had the uncle come out at that time but he never returned with any identifications for us.[5]

Past the living room to the kitchen was a hallway to the left that went in to the back left bedroom. Defendant walked into the bedroom in front of Officer Ammons. Officer Ammons testified he understood the room to be Defendant's bedroom "because he walked in there on his own to get the identification he told me was in the house."

Officer Ammons then testified:

> When he [Defendant] walked in the bedroom, he actually pulled a drawer out ... He tried to shield what he was doing with his body ... as he pulled the drawer out, he reached down to his pocket ... at that point in time, I went ahead and released the lock on my firearm and stepped up on top of Mr. Harvey, I don't know what's in that drawer and I've got family. So as I stepped up on top of him I noticed him throwing identification down in to the drawer and he starts fumbling with some papers with his right hand as I'm watching him as he— the identification never actually gets out of sight—He pulls the identification back out and as he goes to turn around—as I step back there is a rice-a-roni box on the table right beside where that drawer was in plain view and it was open and I could see a plastic bag sticking out with what I thought to be the packaging of heroin which I have probably seen in excess of 50 bricks of heroin...."

Defendant then handed Officer Ammons his identification. Officer Ammons ran the ID. The result was that there were two outstanding warrants on Defendant.

Officer Ammons testified he could smell green or raw marijuana and that triggered his need to clear and secure the residence and seek a search warrant for the house. He contacted the drug task force to obtain one [6].

---

5. This person was the driver of the Jaguar, not Defendant Harvey. The statement of the driver's uncle apparently did not pertain to Defendant Harvey.

6. Officer Ammons explained that as a police officer from Morgantown now involved in a potential search and investigation in Star City, he had to use the Star City police, State Police, Monongalia Sheriff's deputy, or the drug task force to seek the search warrant because he was out of his jurisdiction, but those entities would have jurisdiction. He

## IV. DISCUSSION

### A. The Request for Identification

As already stated, this decision addresses only entry into the residence after the traffic stop. The undersigned has already recommended to the District Judge that she find the traffic stop itself was legal.

In *Soriano–Jarquin*, 492 F.3d 495 (4th Cir.2007), the Fourth Circuit stated:

> We believe a simple request for identification from passengers falls within the purview of a lawful traffic stop and does not constitute a separate Fourth Amendment event. Assuming a lawful stop, an officer is entitled to some chance to gain his bearings and to acquire a fair understanding of the surrounding scene. Just as the officer may ask for the identification of the driver of a lawfully stopped vehicle, *see, e.g., Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), so he may request identification of the passengers also lawfully stopped. No separate showing is required.

The Supreme Court has long held that ensuring officer's personal safety is of critical importance in the conduct of traffic stops. It is well established that officers performing a lawful stop are "authorized to take such steps as [are] reasonably necessary to protect their personal safety" thereafter. *United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985).

Officer Ammons therefore did not violate Defendant's rights by requesting his name and date of birth. More importantly, Officer Ammons testified that when he arrived on the scene, Officer Trump was at the front passenger side window of the vehicle, and indicated to Officer Ammons by making a motion, that he smelled marijuana in the vehicle. This claim was not disputed by Defendant. It was at this point that Defendant was removed from the vehicle. Whether smelling the odor of marijuana in a motor vehicle would result in a reasonable suspicion of a serious crime has been directly addressed by the Fourth Circuit in *U.S. v. Scheetz*, 293 F.3d 175 (4th Cir.2002), as follows:

> Once the car was properly stopped and the narcotics officers smelled marijuana, the narcotics officers properly conducted a search of the car. *United States v. Morin*, 949 F.2d 297 (10th Cir.1991) (holding that, because marijuana has a distinct smell, "the odor of marijuana alone can satisfy the probable cause requirement to search a vehicle or baggage").

Considering all of the above, the officers in this case were permitted to request the driver's and passengers' licenses, remove them all from the vehicle, pat them down, and conduct a search of the vehicle.

### B. Entry into the Home

■■■ The right to privacy in one's home is a most important interest protected by the Fourth Amendment and a continuing theme in constitutional jurisprudence." *United States v. Wilhelm*, 80 F.3d 116 (4th Cir.1996). "Physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980) *quoting United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2135, 32 L.Ed.2d 752 (1972). "At the very core [of the Fourth Amendment] stands the right of a man to retreat into his home and there be free from unreasonable government intrusion." *Silverman v. United States*, 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734 (1961).

elected to use the drug task force to seek the search warrant.

It is undisputed that the entry into and initial entry into and search of Defendant's residence was without a warrant. The United States Supreme Court holds:

It is a "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Groh v. Ramirez*, 540 U.S. 551, 559, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004) (*quoting Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (some internal quotation marks omitted)). Nevertheless, because the ultimate touchstone of the Fourth Amendment is "reasonableness," the warrant requirement is subject to certain exceptions. *Flippo v. West Virginia*, 528 U.S. 11, 13, 120 S.Ct. 7, 145 L.Ed.2d 16 (1999) (per curiam); *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). We have held, for example, that law enforcement officers may make a warrantless entry onto private property to fight a fire and investigate its cause. *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978), to prevent the imminent destruction of evidence, *Ker v. California*, 374 U.S. 23, 40, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), or to engage in "hot pursuit" of a fleeing suspect, *United States v. Santana*, 427 U.S. 38, 42–43, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). "[W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 393–394, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

*Brigham City, Utah v. Stuart*, 547 U.S. 398, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006).

The Government did not expressly argue any exception to the warrant requirement. The Government's Response to both of Defendant's Motions was, in *toto:*

Now comes the United States of America by William J. Ihlenfeld, II, United States Attorney for the Northern District of West Virginia, by Zelda E. Wesley, Assistant United States Attorney, and advises the court the United States will present testimony refuting defendant's claims at the suppression hearing.

[Docket Entry 30]. The court heard the following testimony from Officer Ammons regarding his entry into Defendant's residence:

1. Pursuant to the traffic stop and smell of marijuana in the vehicle, the Defendant, a passenger in the vehicle, was being detained and could not leave.

2. Ammons was permitted under those circumstances to ask for Defendant's identification.

3. Defendant "doesn't really have to provide any identification," but

4. "If he provides me false identification, now he is hindering me by lying to me."

5. Defendant gave him a name he did not recall at the hearing, and it came back as no return.

6. Officer Ammons could not recall what he did after the 911 call came back no return.

7. Officer Ammons testified he "most likely" told Defendant something like, "I got no hit on your information," or "Hey, your info doesn't return."

8. Officer Ammons testified that Defendant had not committed a crime at that point, but had provided false information to him and was hindering the police.

9. Defendant said, "My ID is in my house."

10. Escort of Defendant into his house was not mandatory, but

11. "Of course I would have to escort him in to get that because I'm not letting anyone walk in a house to come back out with identification—so I escorted him inside" and "If he's going into the house, I'm going with him."

12. Officer Ammons did not ask if he could go into the house.

13. Defendant did not tell Officer Ammons he could go into his house.

14. Defendant never told Officer Ammons he could not go into his house.

15. Defendant never expressed, one way or another, whether Officer Ammons could go into the house.

From all the testimony and evidence, the sole argument the undersigned finds may have been made by the Government was that Defendant consented to the entry of his house. The undersigned does not find any "exigent circumstances" in fact existed or were even argued by the Government to exist justifying the officer's warrantless entry into Defendant's residence. However, the undersigned will address that issue in an overabundance of caution.

### *1. Exigent Circumstances*

Officer Ammons testified Defendant did not even have to provide identification and that "escort" by an officer into the residence was "not mandatory." In the recent case of *Kentucky v. King*, —— U.S. ——, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011) the Supreme Court noted three broad categories of "exigent circumstances" serving as exceptions to the warrant requirement of the Fourth Amendment, to wit: (1) the emergency aid exception; the hot pursuit exception; and the prevention of imminent destruction of evidence exception. In

*Brigham City, Utah v. Stuart*, 547 U.S. 398, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006), cited in *Kentucky v. King, Id.* the United States Supreme Court stated as follows:

One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury. "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Id.* at 392, 98 S.Ct. 2408 (quoting *Wayne v. United States*, 318 F.2d 205, 212 (C.A.D.C.1963) (Burger, J.)); see also *Tyler, supra*, at 509, 98 S.Ct. 1942. Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury. *Mincey, supra*, at 392, 98 S.Ct. 2408; see also *Georgia v. Randolph*, 547 U.S. 103, 117–18, 126 S.Ct. 1515, 1525, 164 L.Ed.2d 208 (2006) ("[I]t would be silly to suggest that the police would commit a tort by entering ... to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur")....

.... An action is "reasonable" under the Fourth Amendment, regardless of the individual officer's state of mind, "as long as the circumstances, viewed *objectively*, justify [the] action." *Scott v. United States*, 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978) (emphasis added). The officer's subjective motivation is irrelevant. See *Bond v. United States*, 529 U.S. 334, 338, n. 2, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000).

In another case, *Welsh v. Wisconsin*, 466 U.S. 740, 753, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984), the Supreme Court held that "an important factor to be considered when determining whether any exigency

exists is the gravity of the underlying offense for which the arrest is being made." *Welsh* involved a warrantless entry by officers to arrest a suspect for driving while intoxicated. There, the Supreme Court found the "only potential emergency" confronting the officers was the need to preserve evidence (*i.e.*, the suspect's blood-alcohol level), which the Supreme Court held was an insufficient reason for a warrantless entry into the home.

Again, even though not argued by the United States, the undersigned considered and found no facts which supported any of the other Fourth Circuit recognized types of exigent circumstance exceptions to the warrant requirement of the Fourth Amendment. There was no evidence offered from which the undersigned could conclude that Officer Ammons entered the residence and room of Defendant because he had formed a reasonable belief that contraband or other evidence may be destroyed or removed before a search warrant could be obtained. *Mincey v. Arizona*, 437 U.S. 385, 392–394, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *United States v. Taylor*, 90 F.3d 903, 907 (4th Cir.1996); *United States v. Turner*, 650 F.2d 526, 528 (4th Cir.1981); *United States v. Grissett*, 925 F.2d 776, 778 (4th Cir.1991); *United States v. Moss*, 963 F.2d 673, 679–680 (4th Cir.1992); and *United States v. Reid*, 929 F.2d 990, 993–994 (4th Cir.1991). Nor was any evidence offered which establishes that any of the officers were considering getting a warrant for a search of the residence prior to Ammon's entry and wanted warrantless entry and control of the property while such a warrant was sought. *United States v. Cephas*, 254 F.3d 488, 494–495 (4th Cir.2001). Nor was any evidence offered of hot pursuit, emergency aid, or even officer safety. With respect to the latter, Officer Ammons did not say his reason for having a preconceived notion and plan to follow Defendant in to the residence and private bedroom was for officer safety. He did not release his firearm until he observed Defendant rummaging around in the opened drawer in the bedroom. His statement that he had a family was made relative to that action, not with respect to the decision he made outside near the car to go in the house if Defendant did. Nor is there anything in the record to support a conclusion by the undersigned that this was a protective sweep search by officers incident to the arrest of persons in or immediately outside of the residence in question in order to protect the safety of the arresting and responding officers. There was no evidence to support what Justice White described as a reasonable belief based on specific and articulable facts held by the searching officer that area to be swept harbors individual posing danger to those on arrest scene. *Maryland v. Buie*, 494 U.S. 325, 334, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990).

In the case at bar, Defendant was not under arrest and was not believed to have committed any crime. No one was injured or needed assistance in the residence. There was no arrestable "underlying offense" in this case as regards Defendant. The driver of the car was driving without a license and the officers smelled burnt marijuana in the car. The officers found a bong in the trunk. Defendant was a passenger in the car. There was no evidence Defendant had committed any crime. He was not connected to the bong or the marijuana smell. The police did not find any marijuana in the car and did not test the bong for residue or fingerprints. Whether Defendant provided a false name or Officer Ammons heard the name incorrectly, Defendant's offer that his ID was in his "crib" was an insufficient reason for a warrantless entry into his home.

Accordingly, the undersigned concludes on the totality of the facts of this case that the United States has failed to carry its burden of proving that exigent circumstances existed or that an emergency existed which justified the warrantless police entry into Defendant's home on the date in question.

### 2. Consent

Although not expressly argued, the United States appears to contend that Defendant consented to Officer Ammons entering his residence. A search conducted pursuant to valid consent is a well-recognized exception to the Fourth Amendment's general warrant requirement. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Whether consent to search was given is a factual issue to be determined by this Court in light of all the circumstances. *United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980). *United States v. Vickers,* 387 F.2d 703 (4th Cir.1967) *citing Channel v. United States,* 285 F.2d 217 (4th Cir.1960), *United States v. Rusher,* 966 F.2d 868 (4th Cir.1992). That factual determination will not be disturbed unless it is clearly erroneous. *United States v. Gordon,* 895 F.2d 932, 938 (4th Cir). The government bears the burden of proving consent was given for the search. *United States v. Vickers, supra, citing Wren v. United States,* 352 F.2d 617 (10th Cir.1965).

The Court must determine any challenge to consent, based upon the "totality of the circumstances." Where appropriate, the Court must also determine whether consent was knowing and voluntary. The burden is on the Government to prove consent by a preponderance of the evidence. *See, e.g., United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), *United States v. Boone,* 245 F.3d 352 (4th Cir.2001); *Unit-*

*ed States v. Brugal,* 209 F.3d 353 (4th Cir.2000); *United States v. Elie,* 111 F.3d 1135 (4th Cir.1997); and *United States v. Lattimore,* 87 F.3d 647 (4th Cir.1996).

The factors to be considered in determining whether … consent to search was freely and voluntarily given" are outlined in *Elie, supra:*

> [I]t is appropriate to consider the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter.

111 F.3d at 1144.

■ "Written consent supports a finding that consent was voluntary." *Boone,* 245 F.3d at 362 (emphasis added), *citing United States v. Navarro,* 90 F.3d 1245 (7th Cir.1996). There was, of course, no written consent in this case.

■ Notwithstanding that consent must be knowing and voluntary, the Government does not have a burden to show that an individual was told or otherwise knew he had the right to refuse consent. *See, e.g., Ohio v. Robinette,* 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996). Not even "the drawing of a gun by an arresting officer" or "the handcuffing of the accused establishes involuntariness in and of itself." *Elie, supra* at 1145–1146; however, consent must be more than mere acquiescence to apparently lawful authority. *See Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) (no consent to search if only acquiescence to apparently lawful authority); *Lattimore,* 87 F.3d at 652 (but for defendant's prior consent to search, state trooper's unfounded threat to call a drug dog … raise[s] serious questions concerning the voluntariness of his consent"); *but see*

*United States v. Smith,* 30 F.3d 568 (4th Cir.1994) (unlocking car door and appearing cooperative with police sufficient evidence of consent, rejecting defendant's argument that cooperation was motivated by fear of police).

In this case the issue is simply: "Was consent given, and if so, was it freely and voluntary given?" It is undisputed that there was no written consent. It is also undisputed that there was no express consent. The United States could not contend otherwise because the testimony clearly shows that Defendant did not expressly consent. As Officer Ammons testified, he did not ask for Defendant's consent to enter his home, and Defendant never expressed "one way or the other" whether the officer could enter his home. By process of elimination and even though the United States does not specifically argue it in response to the motion, the undersigned concludes it must be relying on an "implied consent" to enter the home.

The United States has the burden of proof by a preponderance of the evidence since any warrantless search of a person's home is "presumptively unreasonable." *Groh v. Ramirez, supra, United States v. Vickers,* 387 F.2d 703 (4th Cir.1967). The United States appears to argue that Defendant's statement "My ID's in my crib," along with his "allowing" the officers to go with him up the stairs and into his house without protest indicates consent for them to do so.

On occasion, non-verbal consent to searches has been sustained. In *U.S. v. Smith,* 30 F.3d 568 (4th Cir.1994), the police asked a suspect whether they could search his car. The suspect made no verbal response, but approached the car and unlocked it. The police searched the car and found cocaine. The Fourth Circuit held that the suspect's act of unlocking his car door in response to the request by police to search it constituted an implied consent to search. In *U.S. v. Wilson,* 895 F.2d 168 (4th Cir.1990), the court held that the defendant consented to a search of his person by shrugging his shoulders and extending his arms in response to an agent's request to search him. In *U.S. v. Stewart,* 93 F.3d 189 (5th Cir.1996), the Fifth Circuit explained the rather universal truth that "magic words" (such as "yes") are not necessary to evince consent because the "key inquiry focuses on what the typical reasonable person would have understood by the exchange between the officer and the suspect." In *U.S. v. Griffin,* 530 F.2d 739 (7th Cir.1976), the Seventh Circuit underscored the concept that "consent may be in the form of words, gesture, or conduct." In *Robbins v. MacKenzie,* 364 F.2d 45 (1st Cir.1966), the First Circuit held that there was consent where the defendant, after an officer knocked on the door, identified himself as a police officer, and said he wished to talk to the defendant, responded "just a minute," unlocked the door, opened it and then walked back into the room.

By contrast, in *Karwicki v. United States,* 55 F.2d 225 (4th Cir.1932), the Fourth Circuit reversed the defendant's conviction for possession of whiskey. The police encountered Defendant in a saloon. He lived in rooms connected to the saloon. The police told the defendant they had a complaint that whiskey was being sold there, which the defendant denied. An officer then stated, "Well, if there is no whiskey or beer here, you have no objection to our looking around." The defendant did not say anything in response. The officers searched the saloon, finding nothing, and then his connecting rooms, where they found whiskey. The Fourth Circuit held that the search had violated the defendant's Fourth Amendment rights, commenting,

[W]hen officers search without [a] warrant upon consent given by the owner of the property, the consent must be unequivocal and specific, particularly when the premises searched may reasonably be held not to have been covered by the consent given. The fact that [the defendant] did not protest against the search of his living quarters is without significance. He was not required to protest.

Granted, *Karwicki* is an old case, but it has not been reversed or even questioned in this Circuit. The decisions, both finding and not finding consent, teach that, in examining the totality of the circumstances to determine whether a reasonable officer would interpret conduct as consent, it is necessary to consider the question posed by, and the actions of, law enforcement officers to which the defendant's non-verbal conduct was a response. *See U.S. v. Bynum,* 125 F.Supp.2d 772 (E.D.Va.2000).

In *U.S. v. Shaibu,* 920 F.2d 1423 (9th Cir.1990), the defendant walked out of an apartment into a hallway, the officer identified himself and asked whether a third party was in the apartment, and the defendant walked back into the apartment leaving the door open as the officers followed him inside. The Ninth Circuit distinguished those facts from the facts in the Seventh Circuit case, *Griffin, supra,* because in *Griffin* the police had requested entry into the apartment, to which the defendant's conduct in stepping into the apartment and leaving the door open was a non-verbal affirmative response, whereas, in *Shaibu,* the defendant's actions were in response, not to a request for entry, but to a request to identify someone. Thus, they could not be reasonably construed to affirmatively evidence consent to search. Similarly, in *U.S. v. Gwinn,* 46 F.Supp.2d 479 (S.D.W.Va.1999), the district court found dispositive the substance of the law enforcement officer's query in measuring the effect of the defendant's responsive gesture. In *Gwinn,* an occupant did not object to a search of the room in which she was sitting and, at an officer's request, moved from the couch so the officer could retrieve a gun from beneath it. The district court explained:

The Fourth Circuit cases finding implied consent fall into three general categories: cases in which there was a specific request by police officers and a nonverbal affirmative response by an individual, cases in which an individual took some affirmative act that directly exposed his or her property to inspection, and a case in which there was a working relationship between police officers and a cooperating individual.

The Court of Special Appeals of Maryland, following Fourth Circuit case law, held in a case very similar to the case at bar, that police violated a defendant's Fourth Amendment rights by following him to his apartment. *See Turner v. State of Maryland,* 133 Md.App. 192, 754 A.2d 1074 (Md.2000). In *Turner,* a police officer observed a "faded and dirty" vehicle with "fairly new" license tags. Thinking that suspicious, the officer called the tags in over the police radio and learned they were not registered to that vehicle. He attempted to make a traffic stop, but the driver sped off and a chase ensued. The officer eventually forced the vehicle to a stop, at which time the driver "bailed out" of the car and fled.

The officer stayed with the vehicle while other officers pursued the driver. He ran an MVA check, which revealed the car was registered to the defendant and that the defendant lived in a nearby apartment complex. He relayed that information to another officer, who went to the defendant's apartment and knocked on the door. The defendant responded and opened the door, stepping out of the apartment and

onto the landing, pulling the door shut behind him. The officer asked the defendant for identification and asked if he knew where his car was. The defendant responded that he did not know where his identification or his car were. The defendant then accompanied the officer down to the first floor of the building so that the original officer could try to identify him as the driver. (It later was revealed that he was not). The officer once again raised the issue of identification. Both officers asked the defendant whether he had something in his apartment which would confirm his identity. The defendant responded that he had a telephone bill in his apartment that he could show them. He then walked back up the steps to the third floor with the two officers close behind him.

The defendant opened his door and entered. The two officers followed. Nothing was said. The officers did not ask permission to enter or tell the defendant they were about to enter and the defendant did not tell them not to enter. One officer testified that because he was responding to a call for "fleeing and eluding a police officer," he would not have let the defendant out of his sight; however, if the defendant had told him not to enter, he would have complied. He testified that the defendant did not say or do anything to indicate he objected to their presence. The officers saw a gun in plain view as well as crack cocaine. They arrested the defendant and later obtained a search warrant for the rest of his apartment.

Upon Motion to Suppress, the trial court found as follows:

While waiting on the first floor, the [officers] had additional conversation as to whether or not [defendant] could produce any type of identification. It was at that point that [defendant] mentioned that he thought he had a telephone bill with his name on it upstairs in his third floor apartment.

[Defendant] then proceeded to go back up to his apartment with Officer Price following behind him. [Defendant] obviously knew that Officer Price was behind him as they climbed three flights of steps. Once they got to the apartment, [Defendant] opened the door to his apartment and entered. At no time, as they were climbing steps or when they reached the door to the apartment did [Defendant] ever tell Officer Price not to come on back up to the apartment or not to come into the apartment or make any objection whatsoever. There was no evidence that that occurred.

So, I find that the consent, it was a consent search ... at no time did [Defendant] object to the officer entering the apartment when he certainly had an opportunity to do so as they climbed the stairs to the apartment. So, I find that there was no violation of [Defendant's] Fourth Amendment rights....

On Appeal, the Court of Special Appeals of Maryland first noted:

To be sure, the Maryland and Fourth Circuit cases plainly establish that consent to search not only may be express, by words, but also may be implied, by conduct or gesture .... Yet, in all of these cases, the police made it known, either expressly or impliedly, that they wished to enter the defendant's house, or to conduct a search, and within that context, the conduct from which consent was inferred gained meaning as an unambiguous gesture of invitation or cooperation or as an affirmative act to make the premises accessible for entry. By contrast, in those Fourth Circuit cases in which the court concluded that the facts could not support a finding of implied consent, the law enforcement officers either did not ask for permission to

enter or search, and thus did not make known their objective, or, if they did, their request was met with no response or one that was nonspecific and ambiguous.

The court then quoted *Shaibu, supra,* as follows:

> It is one thing to infer consent from actions responding to a police request. It is quite another to sanction the police walking in to a person's home without stopping at the door to ask permission. We do not expect others to walk into our homes, even if the door is open, without first requesting permission to enter. That the police would so enter, without request, created an impression of authority to do so ... We interpret failure to object to the police officer's thrusting himself into Shaibu's apartment as more likely suggesting submission to authority than implied or voluntary consent. Even if there was not implicit coercion in fact here, the government may not show consent to enter from the defendant's failure to object to the entry. To do so would be to justify entry by consent and consent by entry ... We must not shift the burden of proof from the government—to show "unequivocal and specific" consent—to the Defendant, who would have to prove unequivocal and specific objection to a police entry, or be found to have given implied consent.
>
> We hold that in the absence of a specific request by police for permission to enter a home, a defendant's failure to object to such entry is not sufficient to establish free and voluntary consent. We will not infer both the request and the consent.

*Shaibu, supra,* 920 F.2d at 1427. *See also U.S. v. Gonzalez,* 71 F.3d 819 (11th Cir. 1996) (homeowner's failure to bar "follow-on" entry of police into her residence did not constitute implied consent to enter).

In *State v. DeCoteau,* 592 N.W.2d 579 (N.D.1999), police officers went to the defendant's house to investigate an anonymous report of domestic disturbance. When they arrived, the defendant and his girlfriend were outside. Neither knew why the police were there. When the officers noticed a broken window, they told the girlfriend the sound of breaking glass had been reported and they wanted to see whether the children in the house were all right. The girlfriend entered the house and the police followed her, seeing a marijuana pipe in plain view. They subsequently obtained a search warrant. The court held that the girlfriend's conduct did not amount to consent to enter, reasoning that a finding of implied consent required proof that the person who supposedly gave consent engaged in "affirmative conduct" consistent with the giving of consent, not merely that the person did nothing to stop the police from entering. *Id.* at 583 (*citing U.S. v. Jaras,* 86 F.3d at 390; *Shaibu, supra, U.S. v. Wenzel,* 485 F.Supp. 481 (D.Minn.1980) (failure to order uninvited officer to leave apartment is not enough to establish consent); *Robinson v. State,* 578 P.2d 141 (Alaska 1978) (failure to demand that officers leave was not voluntary consent to their entry)).

Another strikingly similar case to the case at bar is *State v. Johnson,* 177 Wis.2d 224, 501 N.W.2d 876 (1993). In that case, officers patrolling an apartment building in a high crime area stopped and frisked the defendant and, finding no drugs or weapons, asked him to produce identification. He told them it was in his girlfriend's apartment in the building. One of the officers then accompanied the defendant to the apartment. When the defendant went inside, the officer followed him. The officer "did not ask for Johnson's permission to enter, and Johnson did not ask him to come in." The court held that consent

"cannot be found by a showing of mere acquiescence." *Id.* at 880 (*quoting Shaibu, supra,* 920 F.2d at 1426–27).

In *Turner,* the original Maryland case here cited, the court first noted that the police had asked the defendant to produce an item that would help establish his identity, and in order to obtain it, he had to enter his apartment. The defendant could not have prevented the officers from following him up to his apartment door, and he was not required to close the door in their faces or turn around and order them to stay in the hallway. In the words of the Ninth Circuit, to do so "would be to justify entry by consent and consent by entry," and would effectively relieve the government of the burden of proving consent. *Shaibu, supra,* 920 F.2d at 1427. The fact that the defendant did not direct the officers to leave his apartment once they were inside did not make the illegal entry legal. The manner in which the police entered the apartment—without asking permission and following close on the defendant's heels—"must have telegraphed to him that they were entitled to be there." The defendant's conduct did not amount to an implicit consent to the police to enter his apartment.

After reviewing the totality of the evidence presented during the hearing, the demeanor of the witnesses on the witness stand, their apparent biases and interests or lack of interest in the outcome of the pending litigation, their opportunity to know the facts to which they testified, and their consistency and inconsistencies, the undersigned concludes that the government has not shown, by a preponderance of the evidence, that Defendant voluntarily consented to the police entering his residence. It is clear that Defendant was being detained and could not leave. It was clear that if Defendant went into his house to prove his identity, Officer Ammons held a preconceived view that he would "escort" him into the house even though he did not express that to Defendant at any time before entry. In short, there is no proof before the undersigned that Officer Ammons said anything to Defendant that Defendant or the undersigned could construe as a request by Ammons for permission to enter Defendant's room, must less the residence. In the absence of the question, nothing Defendant did as described in the evidence could be construed as giving the officer implied consent to enter. At best, Defendant's actions were mere acquiescence to apparently lawful authority. *See Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) (no consent to search if only acquiescence to apparently lawful authority).

Accordingly, the undersigned finds and concludes that the United States has not met its burden of proving by a preponderance of the evidence that Defendant voluntarily consented to Officer Ammons entering his residence. A search prosecuted in violation of the Constitution is not made lawful by what it brings to light. *Byars v. United States,* 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520 (1927). Therefore, the fact that Officer Ammons smelled the odor of green marijuana and saw what appeared to be heroin is not justification for an otherwise unconstitutional search.

### C. The Search Warrant

Subsequent to his entry in to the Defendant's residence and his smelling of green marijuana and his observation of what he believed to be heroin in Defendant's private bedroom, Officer Ammons called on the drug task force to assist him in obtaining a warrant to search the residence. Det. D.W. Helms submitted an affidavit to the Monongalia County Magistrate, Hershel R. Mullens in support of the Complaint for Search Warrant. The probable cause affidavit of D.W. Helms states:

On 12–16–2010 Ptlm. Murphey, of the Morgantown Police Dept., attempted to conduct a traffic stop on a Silver Jaguar for improper registration on University Ave. The vehicle continued to travel into Star City to [*BLANKED OUT*] Avenue, where the traffic stop was completed. During the stop, Samad Harvey and PFC Ammons entered the residence to look for Harvey's identification. PFC Ammons observed Harvey take his id from his personal possession and put into a drawer in a bedroom. Harvey then produced the id and handed it to PFC Ammons. While standing in the room, PFC Ammons detected a strong odor of green marijuana coming from the area where Harvey was standing. In plain view PFC Ammons then noticed a plastic bag sticking out of a Rice a Roni box. In the bag was purple colored wrappers which appeared to be packaging for heroin. The house was then secured by officers. Later another arrestee, Reashaun Billingsly was escorted into the house to look for his id. PFC Ammons secured the bedroom and did not allow Billingsly to enter that room. This investigation started on 12–16–2010 and continued to 12–17–2010.

Once the information gained from the non-consensual search of the residence is excluded from the affidavit, the state magistrate would have been left with and the undersigned, in behalf of this Court on review for probable cause, is left with the following:

On 12–16–2010 Ptlm. Murphey, of the Morgantown Police Dept., attempted to conduct a traffic stop on a Silver Jaguar for improper registration on University Ave. The vehicle continued to travel into Star City to [*BLANKED OUT*] Avenue, where the traffic stop was completed. During the stop, Samad Harvey and PFC Ammons entered the residence to look for Harvey's identification. . . . .

The house was then secured by officers. Later another arrestee, Reashaun Billingsly was escorted into the house to look for his id. PFC Ammons secured the bedroom and did not allow Billingsly to enter that room. This investigation started on 12–16–2010 and continued to 12–17–2010.

Without more, this redacted averment and the search warrant which would have been based on it lacks probable cause for the search of Defendant's room during which the discovery of the gun which is the subject of the indictment against defendant was found. Accordingly, that contraband and only that contraband, including but not limited to the firearm, which was seized pursuant to the search of Defendant's room incident to the state magistrate's search warrant should be suppressed.

### V. Recommendation

For the reasons herein stated, the undersigned accordingly recommends Defendant's Motion to Suppress [Docket Entry 21] be **GRANTED**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Proposed Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir.1984), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984); *Wright v. Collins*, 766

F.2d 841 (4th Cir.1985); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

The Clerk of the Court is directed to send a copy of this Opinion, Report and Recommendation to counsel of record.

September 28, 2012

## REPORT AND RECOMMENDATION/OPINION

On the 24th day of September 2012, came the defendant, Samad Madir Harvey, in person and by L. Richard Walker, his attorney, and also came the United States by its Assistant United States Attorney, Zelda E. Wesley, for a hearing on Defendant's Motion to Suppress Physical Evidence Based on an Illegal Traffic Stop [DE 20] and Motion to Suppress [DE 21], which motions were filed on September 13, 2012. The United States filed a single Response to both Motions on September 21, 2012 [DE 30]. The matter was referred to the undersigned United States Magistrate Judge on September 14, 2012, by United States District Judge Irene M. Keeley [DE 22]. This Report and Recommendation addresses only the first Motion [DE 20]. The second Motion [DE 21] shall be addressed in a separate Report and Recommendation.

### I. Procedural History

On May 1, 2012, Defendant was indicted by a Grand Jury seated in the Northern District of West Virginia at Clarksburg [DE 1]. He was charged with one count of Possession of a Firearm by a Convicted Felon. Defendant was arraigned on August 9, 2012. The motions before the Court were filed on September 13, 2012.

### II. Contentions

Defendant contends:

1. The Indictment is the product of an illegal traffic stop and

2. Any evidence seized as a result of the search warrant issued and executed subsequent to the traffic stop is fruit of the poisonous tree, and should be suppressed.

### III. Statement of Facts

The Court received the sworn testimony of three witnesses under oath, to wit: City of Morgantown Police Officers Jason Ammons and Kenneth Murphey, and Defendant. However, only the testimony of Morgantown Police Officer Kenneth Murphey bears on the issue raised in the motion herein considered. From the evidence and testimony presented, the Court makes the following findings of fact:

Kenneth Walker Murphey, a 4 year member of the Morgantown police department assigned to the street crimes unit, was on patrol in Morgantown, West Virginia on December 16, 2010 at 9:30 p.m. when he observed a silver Jaguar automobile being driven on University avenue without a registration plate showing. He pulled out behind the Jaguar and started following it. There as another vehicle between Officer Murphey's cruiser and the Jaguar. He followed the vehicles from Morgantown into Star City, a separate and contiguous municipality. Officer Murphy was able to conduct a traffic stop on the Jaguar when it pulled in a residential driveway at 3485 University Avenue, Star City, West Virginia.

As he approached the Jaguar Officer Murphey testified he noticed: "there was a white paper displayed in the rear window which was actually a New Jersey temporary registration card." He described what he observed as: "a registration." He further testified that [display of it in the back window] was not a proper way to display a registration referring to Morgantown City Code 351.03. Officer Murphey testified it was his understanding that the

City Code required the registration to "be clearly visible" and "the license must be affixed to the rear of the vehicle and be clearly visible." He stated he was relying on city code and not state law.

On cross-examination Officer Murphey testified to the effect that: in the City of Morgantown the temporary registration must be clearly displayed; after he stopped the Jaguar and turned his spotlight on the vehicle he saw a valid registration in the rear window; the registration he observed was not concealed by any item; the rear window was not tinted to his knowledge; and, he could read the registration when he approached the vehicle. However, he denied it was clearly displayed because he "could not see that registration as the vehicle passed me." He stated he was sitting on the side of University Avenue when he observed the silver Jaguar crossing from left to right in front of him and there "was no registration in the proper registration spot." He said he did not see anything in the Jaguar window when it drove past him even though he looked. He explained by "proper spot" he was referring to where the license plate would normally go. He explained that he went to the driver's side of the Jaguar after he saw the registration in the rear window because he had stopped the vehicle for not having the registration displayed in the proper location under the City Code and was going to give the driver a verbal warning for that infraction. At this point of the stop Officer Murphey admits he had not observed any other violation by the driver of the Jaguar or with respect to the vehicle itself under the Morgantown City Code.

Officer Murphey further testified he proceeded to the driver's side of the Jaguar and advised the driver why he was being stopped noting that there were three black males including the driver in the vehicle. He then asked the driver for his driver's license, vehicle registration card and proof of insurance. The driver was unable to give his license or the other information stating that it was his uncle's car and he did not have a driver's license on him. When asked for his name and date of birth, the driver gave Officer Murphy the name of Shawn Williams and a date of birth. Officer Murphey called in the name and date of birth and was advised that there were no records found for that name and date of birth indicating the driver had given Officer Murphey a false or fictitious name. Officer Murphy then advised the driver that the name he gave was false. By the end of the traffic stop the driver gave Officer Murphey the name and date of birth of and for a Rashawn Billingsley. When Officer Murphey ran the new name and date of birth through New Jersey records, it was returned as the correct name for the driver. The check also revealed that Billingsley's driver's license had been suspended. Once the license of the driver had been determined to have been suspended, Officer Murphey placed Billingsley under arrest for driving on a suspended license and obstructing an officer. He did not give the driver a ticket for improper registration or any other driving infraction or violation.

## IV. DISCUSSION

As already stated, this decision addresses only the original traffic stop.

It is well established that the "[t]emporary detention of individuals during the stop of an automobile by the police ... constitutes a 'seizure,'" no matter how brief the detention or how limited its purpose. *U.S. v. Branch*, 537 F.3d 328 (4th Cir.2008) (*citing Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.E.2d 89 (1996)). "An automobile stop is thus subject to the constitutional imperative that it

not be 'unreasonable' under the circumstances." *Whren, supra,* at 810, 116 S.Ct. at 1769. The issue is two-fold: "whether the officer's action was justified at its inception," *United States v. Rusher,* 966 F.2d 868 (4th Cir.1968), and, if so, whether the continued stop was "sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). The Court must evaluate "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). Based on this dual inquiry, the undersigned must first determine whether Officer Murphey's action was justified at its inception.

To justify stopping a vehicle, an officer must have reasonable suspicion that illegal activity has occurred or is occurring. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). This analysis "turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time." *Rusher, supra,* at 875. The Fourth Circuit has held that a traffic stop is valid if it is legally justified at its inception, regardless of the motive behind the stop. *U.S. v. Hassan El,* 5 F.3d 726 (4th Cir.1993).

■■■ Whether there is reasonable suspicion depends on the totality of the circumstances, including the information known to the officer and any reasonable inference to be drawn at the time of the stop. *United States v. Arvizu,* 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002); *United States v. Crittendon,* 883 F.2d 326 (4th Cir.1989). The legitimacy of an investigative stop thus turns on what constitutes "reasonable suspicion," which the Fourth Circuit has called "a common-sensical proposition ... [properly] crediting the practical experience of officers who observe on a daily basis what transpires on the street." *United States v. Lender,* 985 F.2d 151 (4th Cir.1993). *Accord Arvizu,* 534 U.S. at 273, 122 S.Ct. 744 (permitting "officers to draw on their experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person")(internal quotation omitted.) "[T]he reasonable suspicion standard defies precise definition, [but] it is less demanding than probable cause and falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Griffin,* 589 F.3d 148 (4th Cir.2009).

■■■ Because the intrusion created by an investigative stop is minimal, the reasonable suspicion standard is not onerous. *See, e.g., United States v. McCoy,* 513 F.3d 405 (4th Cir.) *cert. denied,* 553 U.S. 1061, 128 S.Ct. 2492, 171 L.Ed.2d 781 (2008); *United States v. Harris,* 39 F.3d 1262 (4th Cir.1994); *United States v. Turner,* 933 F.2d 240 (4th Cir.1991). On the other hand, an officer's reliance on a "mere hunch," *Arvizu, supra* at 274, is insufficient to establish reasonable suspicion.

Regarding vehicles in particular, "[o]bserving a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." *United States v. Branch,* 537 F.3d 328 (4th Cir. 2008).

Morgantown City Code Section 351.03 [Court Exhibit 1] [1] provides:

---

1. Near the conclusion of Officer Murphey's testimony, at the undersigned's request, Officer Murphey produced a copy of the Morgantown ordinance: Code Section 351.03. The

Registration plates issued for vehicles required to be registered shall be attached to the rear thereof.

Every registration plate shall at all times be securely fastened in a horizontal position to the vehicle for which it is issued so as to prevent the plate from swinging and at a height of not less than twelve inches from the ground, measuring from the bottom of such plate, in a place and position to be clearly visible and shall be maintained free from foreign materials and in a condition to be clearly legible.[2]

The credible and uncontradicted testimony in this case is that Officer Murphey did not see any registration plate whatsoever on the vehicle prior to making the traffic stop. He testified he stopped the vehicle pursuant to Morgantown City Code Section 351.03. *United States v. Lender, supra* and *United States v. Branch, supra.* The undersigned finds Officer Murphey had reasonable suspicion to justify stopping the vehicle.

Defendant argues that the Code Section does not apply because the vehicle had a temporary paper plate. He does not cite any law or case that differentiates the placement of the temporary plate from that of a regular, permanent plate. Neither could the undersigned find a City of Morgantown Code section, a West Virginia Supreme Court of Appeals decision or a Fourth Circuit decision interpreting the Code section differently than had Officer Murphey.

The Fourth Circuit, in an unpublished opinion, interpreted a similar North Carolina Code section to apply to temporary plates as well as permanent plates. *U.S. v. Lucas,* 322 Fed.Appx. 326, 2009 WL 795028 (4th Cir.2009) (unpublished), *cert. denied* 558 U.S. 868, 130 S.Ct. 182, 175 L.Ed.2d 115 (2009).[3] In *Lucas,* the defendant appealed from his conviction after pleading guilty to possession of a firearm by a felon. As in this case, Lucas claimed the traffic stop that led to his arrest was not supported by reasonable suspicion or probable cause, "as the placement of his temporary registration plate in the window of his vehicle rather than the bumper did not violate any North Carolina motor vehicle regulation." *Id.* at *1. The Fourth Circuit stated:

> In ruling on the motion to suppress, the district court noted that, pursuant to N.C. Gen.Stat. Ann. section 20–63(d)(2007), a vehicle registration plate is required to be "attached to the rear of the motor vehicle." The district court found that the statute lacked a specific definition as to what constituted the "rear" of the vehicle and conceded that placing the registration tag in the back window, as Lucas had done, could arguably constitute compliance with the terms of section 20–63(d). The district court concluded, however, that section 20–63(d) could not be read in isolation, as another motor vehicle statute, N.C. Gen.Stat. Ann. Section 20–129(d) (2007), supported the officer's interpretation as to "proper placement" of the license plate, as a plate that was placed in the window could not be properly illuminated as required under section 20–129(d).

*Id.* at *2. The court continued:

> [W]e agree with the district court that, under the circumstances of this case, the

---

Court takes judicial notice of the same as being the ordinance in force and effect on the date of the traffic stop at issue.

**2.** Section 351.03 mirrors West Virginia Code Section 17A–3–15.

**3.** Pursuant to CTA4 Rule 36(c), a copy of *Lucas* is attached hereto. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

display of the registration tag was unlawful under North Carolina law, as the tag was not properly illuminated under section 20–129(d) of the North Carolina Code. Accordingly, the fact that the tag was displayed in the rear window in a manner in which it was unreadable provided the officer with probable cause to stop Lucas' vehicle. Hence, the district court properly denied Lucas' motion to suppress.

Like the North Carolina Code section, Morgantown Code Section 351.03 requires the registration plate to be "attached to the rear" of the motor vehicle. N.C. Gen. Stat. Ann. Section 20–129(d), requires:

> One rear lamp or a separate lamp shall be so constructed and placed that the number plate carried on the rear of such vehicle shall under [normal atmospheric] conditions be illuminated by a white light as to be read from a distance of 50 feet to the rear of such vehicle.

Morgantown Code Section 345.05, entitled Tail Light; Illumination of Rear License Plate, provides:

> Either a tail lamp or a separate lamp shall be so constructed and placed as to illuminate with a white light the rear registration plate and render it clearly legible from a distance of fifty feet to the rear.

Upon consideration of the credible, undisputed testimony of Officer Murphey, and in accord with the Fourth Circuit in *Lucas,* the undersigned finds that Officer Murphey had reasonable suspicion and sufficient justification to initiate the traffic stop. The stop was therefore legally justified at its inception and did not violate Defendant's Fourth Amendment rights. *United States v. Crittendon, supra.*

The second step in evaluating the Fourth Amendment implications of the traffic stop is whether the continued stop was "sufficiently limited in scope and duration to satisfy the conditions of an investi-gative seizure." *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). The Court must evaluate "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985).

Defendant argues that Officer Murphey's reasonable suspicion ended once he realized there was a valid, temporary New Jersey tag on the vehicle. He was therefore not justified in detaining the driver or Defendant, or in asking for the driver's license and registration, and evidence obtained after this point must be suppressed as fruit of the poisonous tree.

Officer Murphey testified, his report indicates, and it is undisputed by Defendant that the temporary registration was in the rear window of the vehicle. It is also undisputed that Officer Murphey could not see the plate until after he effectuated the traffic stop. His report and testimony indicates that he then "approached the driver and told him why he had been stopped." He testified that there was no indication the temporary registration itself was illegal, but that it was not properly displayed pursuant to the Morgantown City Code, because it was not "affixed to the rear of the vehicle" and was not "clearly visible." He further testified that he had planned to give the driver of the vehicle a verbal warning for the violation, but subsequently discovered the driver's license had been suspended and arrested him instead for driving on a suspended or revoked operator's license, non-DUI.

The undersigned finds that, even after Officer Murphey saw the temporary registration in the rear window, the fact that the tag was displayed in the rear window in a manner in which it was not clearly visible provided him with probable cause

to approach the vehicle in which Defendant was a passenger and conduct further inquiry of the driver incident to investigation of the improperly displayed registration.

The undersigned United States Magistrate Judge therefore finds no Fourth Amendment violation in the traffic stop, and recommends Defendant's Motion to Suppress Physical Evidence Based on an Illegal Traffic Stop be denied.

### V. Recommendation

For the reasons herein stated, the undersigned respectfully recommends Defendant's Motion to Suppress Physical Evidence Based on an Illegal Traffic Stop [Docket Entry 20] be **DENIED.**

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Proposed Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce,* 727 F.2d 91 (4th Cir.1984), *cert. denied,* 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984); *Wright v. Collins,* 766 F.2d 841 (4th Cir.1985); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

September 26, 2012

